Filed 5/26/21  P. v. Reeves CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THOMAS REEVES,<br><br>    Defendant and Appellant. | H045376<br>(Santa Clara County<br>Super. Ct. No. C1769774) |

A jury convicted defendant Thomas Stacey Reeves, an English tutor, of committing several sex offenses against his 15-year-old student.  The trial court found true that defendant had suffered three prior strike convictions and sentenced him to 225 years to life in state prison.  On appeal, defendant challenges the denial of the numerous *Marsden*[1] motions he filed seeking to replace his appointed trial counsel.  He also raises a number of claims of error based on the admission of expert testimony regarding Child Sexual Abuse Accommodation Syndrome.  Finding no prejudicial error, we shall affirm.

I.    **BACKGROUND**

    *A.    Factual Summary*

        *1.    Prior Convictions and Parole Conditions*

In 2003, defendant pleaded no contest to two sex offenses involving two minor victims—continuous sexual abuse against a child under the age of 14 and assault with

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

intent to commit a lewd act on a child under the age of 14. One of the minor victims was defendant's neighbor, the other was a student at the elementary school where he taught. In 2005, defendant pleaded no contest to attempted lewd acts on a fictional 12-year-old girl. In that case, defendant had conversations online and on the phone with a man who claimed to have been sexually active with a 12-year-old girl. Defendant and the man, who was in fact a special agent for the California Department of Justice, arranged to meet at a hotel where defendant could engage in sex acts with the girl. Defendant went to the hotel with condoms and a Barbie doll; he was arrested.

Defendant served time in prison and was released on parole in August 2013. As a result of his prior convictions, he was required to register as a sex offender and to wear a GPS monitoring device. Defendant's parole conditions precluded him from having contact with minors.

While released on parole, defendant worked as a tutor, teaching English as a second language. He told his parole officer that his students were all adults. However, in 2015, he decided to tutor three minors, including D. He was 50 years old at that time.

### 2. *Defendant's Relationship with D.*

D. moved to San Jose from her native Ukraine in the summer of 2015, when she was 14 years old. She lived in an apartment in a large apartment complex with her mother and step-father, who hired defendant to tutor her in English shortly after the move. Defendant had been recommended to them by Ukrainian friends who defendant had previously tutored. That summer, defendant tutored D. twice a week at a Starbucks in the apartment complex. Defendant also tutored other students who lived in the same apartment complex as D. at that Starbucks.

In the fall of 2015, D. entered ninth grade. Her tutoring sessions with defendant continued and, according to D., she and defendant became close friends. In late October, defendant gave her a gift for her 15th birthday. When she hugged him "in gratitude," he kissed her on the lips, which surprised her. She then told defendant that she had "read an

article about him [and] about his past on the Internet." She testified that, initially, "he wanted to hush it up." However, a few days later, he brought it up and told her that "it was kind of conspiracy or framing. He was not guilty. He was not to blame." At that time, defendant also told D. that he liked her and wanted to start dating. She felt "a little bit uncomfortable having read about his past on the Internet," but she "liked the fact that he liked" her and she agreed to date him. Defendant told her not to tell anyone about their relationship and she agreed to keep it secret.

After they started dating, they would kiss and hold hands after tutoring sessions. They communicated through the messaging app Telegram. D. testified that defendant "was afraid all the time that he might get discovered," so they agreed that he would message her a pumpkin as a signal that it was him. The relationship became sexual. D. testified that defendant came over to her apartment when her parents were not home. On approximately 10 of those occasions, they went into her bedroom and engaged in sex acts. Once or twice, defendant's finger went between the lips of her vagina. Defendant's mouth touched her vagina between 10 and 15 times. She orally copulated him about five times. The first time, he pushed her down towards his penis, she resisted, but eventually gave in. D. testified that they were in love and talked about getting married. For Valentine's Day, defendant gave D. a card that read, in Spanish, "I adore you. I desire you. I need you. . . . How do I say it? I love you."

In late June 2016, D.'s parents learned that defendant was a registered sex offender. D.'s mother searched D.'s room for any evidence of an improper relationship between her daughter and defendant. She found a notebook that convinced her they "had some kind of a relationship." D.'s mother took pictures of seven pages in the notebook, which she testified were the only pages on which defendant was mentioned.[2]

---

[2] Only those photographs were introduced into evidence; the notebook itself was not. D. testified that she threw it away.

D.'s mother then checked "the history of [D.'s] movements around using her phone," and discovered that D. had been going places without her mother's permission. The mother called the police on or around July 2, 2016.

Around this time, D. saw an article about defendant open on her parents' computer. She messaged defendant that her parents knew about his prior convictions. The following day, police officers came to D.'s apartment to talk to her about defendant. She lied to them about her relationship with defendant because she "was trying to cover for" him.

After the police officers left, D.'s mother told D. that she knew D. had not been truthful with the officers and that she needed to tell the truth. The mother told D. that lying to the police could jeopardize the family's immigration status. D.'s mother further explained that the family had decided to move to the United States, in part, because "people follow and abide the laws, and you feel like you're protected by the legal system as opposed to what's happening in Ukraine. And the reason the system is such as it is, is that people give truthful testimony unrelated to what they think about this or other person."

D. then admitted to her mother that something physical had happened between herself and defendant. D. was upset and crying. She did not offer details and her mother did not push her to provide any.

D. showed her mother messages she had exchanged with defendant in recent days. D.'s mother or stepfather took screenshots of the messages, which were admitted into evidence. One message from D. stated: "Tom, I love you. I love you so much. I want to see you now and feel your warmness." Defendant responded "Oh, my, I love you so much too," followed by three hearts. Defendant also texted D., "I already miss you so much"; "I feel like I will fall apart if I don't see you"; and "Good night, precious." In one message, D. called defendant "honey."

D. was later interviewed at the police station and disclosed the physical relationship with defendant. D. testified that she continued to believe that defendant "is a good person" and "didn't do anything bad" to her.

Defendant testified on his own behalf and denied having a romantic or sexual relationship with D. He acknowledged that he took D. out to dinner more than once, to a museum, and to an art gallery, but said those outings were part of his lesson plans. He testified that messaging a pumpkin was not a secret code, "it was a manual way of creating the power button sign" to show that he was online and available to respond to text messages. He testified that he used the same symbol with multiple students. Defendant acknowledged sending D. the messages discussed above. He testified that his love for D. was platonic, not romantic.

Defendant testified that he had more than 25 students who lived in the same apartment complex as D. He made about half of his income from students in that complex. He was at the complex tutoring students between two and five times a week. Defendant testified that he generally did not schedule tutoring sessions too late in the evenings, explaining "[i]f we were meeting 8:00, go to 9:30, 10:00, it starts to get ridiculous. But there were a few times people wanted help with job interviews or they wanted me to look at their applications, resumes, and I would meet people sometimes at 11:30, 12:00."

Regarding his prior convictions, defendant testified that, in each instance, he was coerced into taking a plea bargain. He denied any wrongdoing.

### 3. GPS Evidence

As noted, defendant wore a global positioning system (GPS) monitoring device as a condition of his parole. An expert in GPS technology testified that the device defendant wore was programmed to acquire its position (in longitude and latitude) every minute. It was further programmed to send that GPS data via cellular technology to a server every 10 minutes. In the expert's experience, the GPS coordinates provided by devices like the

5

one defendant wore are accurate within 50 feet.  The addition of barriers between the GPS signal and the receiver increases the inaccuracy; therefore, when a person is outdoors, the GPS coordinates tend to be more precise.  The expert noted that GPS signals cannot penetrate concrete, so a position may not be able to be obtained if a person is in a parking garage, for example.

The parties stipulated that, if called to testify, D.'s step-father would testify that he and his wife took several overnight trips in 2016 during which D. was left home alone overnight.  The parties stipulated to the specific dates of those trips.  A defense investigator testified that he analyzed the GPS data from defendant's ankle monitor and determined that defendant was not present in the vicinity of D.'s apartment building for a stretch of more than 45 minutes on any of those dates.

The investigator acknowledged on cross-examination that there were occasions on which defendant was in the vicinity of D.'s apartment building late in the evening.  For example, on June 5, 2016, he was there from 8:44 pm until 10:33 pm; on June 21, 2016, he was there from 9:47 pm until 11:08 pm; and on June 24, 2016, he was there from 8:54 pm to 11:13 pm.

### 4.    CSAAS Evidence

Blake Carmichael, Ph.D., a psychologist at the University of California at Davis Children's Hospital Care Center, testified for the prosecution as an expert in the area of Child Sexual Abuse Accommodation Syndrome (CSAAS).  He explained that CSAAS first was discussed in a 1983 article by Dr. Roland Summit and was based on behavior Summit and his colleagues had observed in the children they treated who had been sexually abused.  The objective was to "dispel some of the myths or . . . challenge some of the preconceptions people have about kids who we know have been sexually abused" by explaining that, among other things, "they don't tell about it the same way that people might expect or hope for kids who have been abused."

Dr. Summit identified five common patterns of behavior in the child sexual abuse victims he treated: secrecy, helplessness, entrapment or accommodation, delayed and unconvincing disclosure, and retraction. Carmichael testified that CSAAS is "not a mental health disorder," "a symptom checklist," or a diagnostic tool. Instead, it is "a tool to help people understand why certain things may happen or why certain kids might not do certain things you expect them to do after having been sexually abused."

### 5.    Protective Order

On July 28, 2016, the superior court issued a written protective order prohibiting defendant from having any contact with D., including through a third party.

Defendant and Jose Ballesteros Chavez were housed in the same housing unit in February 2017. Chavez was released from custody on February 20, 2017. During a March 1, 2017 search of Chavez's car, his parole officer found a handwritten document with defendant's name and booking number on it. The document also included apparent instructions to contact D. on Facebook on defendant's behalf. Specifically, it stated D.'s full name; "original country: Ukraine"; "living in San Jose"; "1. send a friend request"; "2. if she replies, send her a picture of a pumpkin"; "3. to her reply, send a picture of three pumpkins and three X X X"; "you can send her a happy face, fox, wolf, pizza, candle"; "send me her reply. Don't reply to her until I send you a reply"; "I want a Facebook page"; "Tom Reeves, Sunnyvale."

### B.    Procedural History

The Santa Clara County District Attorney charged defendant with four counts of lewd acts on a child age 14 or 15 (§ 288, subd. (c)(1); counts 1-4), four counts of oral copulation with a minor under 16 years of age by a person over the age of 21 (§ 287, subd. (b)(2)/former § 288a, subd. (b)(2); counts 5-8), three counts of sexual penetration of a person under the age of 16 by a person over the age of 21 (§ 289, subd. (i); counts 9-11), attempted violation of a protective order (§§ 664/166, subd. (c)(1); count 12), and working with minor children as a sex offender (§ 290.95, subd. (c);

7

count 13).  The information also alleged that defendant had suffered three prior strike convictions (§§ 667, subd.(b)-(i), 1170.12).

The case went to trial in October 2017.  During the trial, the People elected not to proceed on two of the sexual penetration counts (counts 10 & 11), which were not submitted to the jury.  The jury returned guilty verdicts on all of the remaining counts on October 24, 2017.

Following a court trial, the trial court judge found true the allegations that defendant had suffered three prior strike convictions.

Defendant filed a *Romero*[3] motion to strike one of his prior strike convictions.  On December 15, 2017, the trial court denied that motion and imposed sentence.  The court sentenced defendant to a state prison term of 225 years to life consisting of nine consecutive 25-years-to-life terms, imposed pursuant to the Three Strikes law, on counts 1 through 9.  As to counts 12 and 13, the court sentenced defendant to concurrent terms of 30 days in county jail with credit for time served.

Defendant timely appealed.

## II.    DISCUSSION

### A.    *Marsden Motions*

Defendant filed 10 *Marsden* motions seeking to replace his appointed trial counsel.  The trial court denied each motion, which defendant says was error.  Specifically, defendant argues that the trial court abused its discretion in failing to recognize the irreconcilable conflict between himself and his appointed counsel.

#### 1.    *Legal Principles*

"[C]riminal defendants are entitled under the Constitution to the assistance of court-appointed counsel if they are unable to employ private counsel." (*Marsden*, *supra*, 2 Cal.3d at p. 123.)  In *Marsden*, our Supreme Court "explained that 'the decision

---

[3] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court,' that 'a defendant has no absolute right to more than one appointed attorney,' and that a trial court is not bound to accede to a request for substitute counsel unless the defendant makes a ' " 'sufficient showing . . . that the right to the assistance of counsel would be substantially impaired' " ' if the original attorney continued to represent the defendant." (*People v. Sanchez* (2011) 53 Cal.4th 80, 87 [quoting *Marsden*, at p. 123].)

" 'When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion.' " (*People v. Smith* (1993) 6 Cal.4th 684, 691 (*Smith*).) Accordingly, we review the denial of a *Marsden* motion for abuse of discretion. (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) " 'Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' [Citation.]" (*Smith*, *supra*, at pp. 690-691.) "Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*).)

Tactical disagreements do not by themselves constitute an irreconcilable conflict. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1001 (*Frederickson*).) " ' "[C]ounsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." [Citation.]' [Citations.]" (*People v. Jackson* (2009) 45 Cal.4th 662, 688; *Fredrickson*, *supra*, at p. 1001 ["it is defense counsel's job to determine how best to achieve a client's objectives"].) " '[A] trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any

9

disagreements with counsel . . . .' [citation]." (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)  Nor is a " 'claimed lack of trust in, or inability to get along with, an appointed attorney . . . sufficient to compel appointment of substitute counsel . . . .' " (*Ibid*.)

### 2. *Factual Background*

Defendant filed 10 *Marsden* motions between August 23, 2017 and December 15, 2017.  We summarize the issues raised at each hearing below.

### a. *First* Marsden *Hearing – August 23, 2017*

At the first *Marsden* hearing, on August 23, 2017, defendant stated that his copies of the discovery, including an iPod with witness interviews on it, had been confiscated in jail and counsel had failed to replace them.  Trial counsel responded by agreeing to provide defendant with a full set of discovery.  Trial counsel explained that his office had a very limited number of iPods and that they all were in use by other clients, but that he was working to procure a device for defendant.

Defendant further stated that counsel had failed to adequately discuss trial strategy with him, ask certain questions during interviews of potential witnesses, contact a valuable witness, obtain D.'s full notebook (which he referred to as a journal), adequately investigate the GPS data, and hire a witness coercion expert or otherwise pursue a defense that D. was coerced into making false accusations against defendant by her parents and the police.  Defendant also expressed that he did not like the way counsel spoke to him and that counsel had "always taken the position of guilt, of how bad things look."  Defendant said he believed counsel was dishonest with him at times.

Counsel responded that his office had conducted further witness interviews and the investigator had asked those questions proposed by defendant that counsel deemed relevant.  Counsel further represented that he was attempting to contact the potential witnesses identified by defendant despite counsel's belief that they may not help defendant's case.  Counsel also stated that he was working to determine whether there were journal pages that had not been disclosed, that he had hired a GPS expert, and that

10

he had contacted an expert on confirmatory bias. Counsel noted that he was not optimistic that he could convincingly argue that D. had been coerced into making false accusations given her testimony at the preliminary hearing. Finally, counsel opined that some of the tension with defendant arose from counsel's "realistic outlook on this case," given the nature of the charges and the evidence of defendant's prior convictions, which likely would come in under Evidence Code section 1108.

During the lengthy hearing, the court noted that defendant appeared to be playing "kind of a game of 'gotcha' " as opposed to working collaboratively to resolve his issues with counsel. The court also told defendant: "I can't say that I resolved credibility issues in your favor." The court denied the motion.

### b. *Second* Marsden *Hearing – September 20, 2017*

Defendant made a second *Marsden* motion on September 20, 2017. Defendant reiterated a number of issues raised in the prior hearing—that he had not been provided a new iPod, that counsel had not interviewed certain witnesses, that counsel had not retained an expert on coercion, that counsel had failed to obtain D.'s full journal, and that counsel was too negative in terms of telling defendant how the jury was going to look at things. Defendant further stated that counsel was not communicating with him frequently enough and had failed to retain an expert to analyze the GPS data.

Counsel responded that he was still working on the iPod issue, had tried but been unable to make contact with one of the witnesses defendant wanted him to call, had hired and was working with a GPS expert, and did not agree with defendant that arguing that D. was coerced into making false accusations was a good strategy given D.'s testimony at the preliminary hearing.

The court denied the motion.

### c. *Third* Marsden *Hearing – September 26-27, 2017*

Defendant made his third *Marsden* motion on September 26, 2017; the court held a hearing on that motion over the course of two days. Defendant repeated several issues

he previously had raised, including counsel's failure to provide a new iPod, failure to retain a coercion expert, failure to investigate (including by contacting certain witnesses, examining the GPS data, and scrutinizing D.'s journal in terms of authenticity and accuracy of the translation). Defendant also stated that counsel had failed to visit and communicate with him frequently enough and expressed disagreement with defense strategies counsel has proposed (such as attempting to impeach D. by asking her to describe defendant's penis). During defendant's presentation, the trial court repeatedly reminded him that this was not an opportunity to try his case to the court and to focus on issues with his attorney that had arisen since the last *Marsden* hearing. Defendant responded by accusing the court of "derailing my forum." Defendant also stated: "I'm being compelled and I've initiated the process of taking out a civil suit against the Alternate Defender's Office, and specifically [my appointed counsel,] Mr. Camp, for defamation of character, for undermining my defense, for wanting to tank my case."

Counsel responded that he continued to investigate the GPS data and outlined his other efforts since the prior *Marsden* hearing.

The court denied the motion.

### d. Fourth Marsden *Hearing – September 28, 2017*

The following day, a Thursday, defendant filed his fourth *Marsden* motion. He again indicated he had not received a new iPod, that counsel did not visit him with sufficient frequency, that not enough had been done to develop a robust defense, and that counsel was too negative about the likely outcome of trial. Counsel responded that he and defendant wanted to pursue different strategies, saying "Mr. Reeves wants me to call his adult students to testify that he tutors them and takes them to movies and stuff like that. I don't see how that helps explain any of that evidence that I just listed [e.g, the text messages and Evidence Code section 1108 evidence]. [¶] So largely this case is going to be about cross-examination."

12

Defendant also told the court that he did not trust counsel because counsel had been dishonest. As an example, defendant represented that counsel said in one prior hearing that he intended to have D. draw defendant's penis at trial, only to deny that that was his intent at a later hearing. The court expressed the view that there appeared to be a misunderstanding. Counsel agreed, explaining that he was considering asking the witness to describe defendant's penis but not to draw it.

The court ordered counsel to visit defendant "before Monday morning." The court then denied the motion, stating "[a]lthough there is clearly disagreement about strategy in this case, although there is clearly disagreement about personalities in this case, it is also clear to the Court that at this point, [counsel's] representation is far higher than adequate. And even with the tension, [counsel] is quite capable and prepared and willing to continue to represent Mr. Reeves. And there has not reached such a level of conflict that his representation will be compromised."

*e.* *Fifth* Marsden *Hearing – October 2, 2017*

A fifth *Marsden* hearing was held on October 2, 2017, at which time jury selection was taking place. Defendant raised concerns about the accuracy of the translation of D.'s journal, the admission of evidence of his prior convictions under Evidence Code section 1108, and the retention of an expert on coercion.

Counsel responded that his office and the District Attorney's Office each had the journal translated into English. The parts of the journal that were damaging to defendant were the same in both translations; "some of the kind of collateral words . . . were different." Counsel and the prosecutor reached a stipulation as to how those portions would be translated. Counsel represented that he "spend about a half an hour" the previous Friday talking to defendant "about the 1108 evidence. . . , how it was going to be characterized, the questions he'd be asked on direct examination if he decided to testify."

The court denied the motion.  In doing so, the court told defendant that "[t]he expectation of this Court is that you will work with your attorney.  And it's clear to this Court that your attorney is very much willing to continue to work with you."

f.        *Sixth* Marsden *Hearing – October 3, 2017*

The sixth *Marsden* hearing took place the next day.  Defendant stated that counsel's decision to work with the prosecutor to reach a stipulation regarding the journal constituted a violation of attorney-client privilege and counsel's duty of loyalty.  Defendant also complained about the manner in which counsel was investigating the GPS data.  After allowing counsel to respond, the court denied the motion.  In doing so, the court reminded defendant that his appointed counsel "has graduated from law school, taken the bar, and has tried a number of cases.  And he made the decision to have the entire journal translated or at least portions of the journal provided to him translated by his own team, and then reviewed the translation also provided by the DA's team before he had any conversations with the DA's office.  [¶]  So any representation that he simply melded or - had a conversation with the DA's office and more or less gave up your rights in this, what you use key area of your case, in this Court's opinion, is missing some of the legal strategic knowledge that [counsel] has on your behalf.  [¶]  So it is disappointing that you view it differently, but I hope that at least part of you can understand that there may be some legal reasons why he has done what he's done and some strategic reasons why he's handled it the way he has."

g.        *Seventh* Marsden *Hearing – October 4, 2017*

The next day defendant made his seventh *Marsden* motion.  During the hearing, he took issue with the court's rulings on in limine motions and stated that counsel failed to properly inform him about and include him in the jury selection process.  Defendant attempted to discuss his view of D.'s journal and the translation issue again; the court stopped him and directed counsel to visit defendant early the following week to discuss those concerns.

14

Counsel responded that defendant "participated in the process of deselecting jurors," shared "ideas about [voir dire] questions," and "suggested jurors . . . [to] strike." Counsel said he never got the sense that defendant did not understand the process. Counsel further stated that he and defendant had "agree[d] on most things" during the jury selection process and he thought they had "worked together in that respect."

The court denied the motion.

### h. Eighth Marsden Hearing – October 11, 2017

The eighth *Marsden* hearing was held on October 11, 2017, which was the day opening statements were given and testimony began. During that *Marsden* hearing, defendant stated a number of objections to counsel's handling of his case including counsel's approach to the prior convictions (counsel urged defendant to admit to making mistakes given he had pleaded to the crimes, defendant wanted to attempt to prove his innocence of the prior crimes); his choice of witnesses; and his refusal to pursue a coercion defense. Defendant also complained about counsel using a computer to access information during court proceedings because defendant was unable to see the screen. Defendant raised various issues discussed in prior *Marsden* motions, including the translation of the journal and the investigation of the GPS data.

Counsel responded that he was "not pressuring [defendant] to admit his prior offenses" but believed that he was "hampered from denying them based on the fact that he has guilty pleas for all of them" and therefore might benefit from admitting to making mistakes and testifying "that he learned his lesson and has since moved on." Among other things, counsel further stated that many of the witnesses defendant suggested had been interviewed and counsel had made the tactical decision not to call them because he anticipated they would be more damaging than beneficial.

The court denied the motion.

### i. *Ninth* Marsden *Hearing – November 3, 2017*

On November 3, 2017, after the jury returned its verdicts, defendant made his ninth *Marsden* motion. Defendant objected to various strategic decisions counsel made at trial including counsel's failure to present a defense that D. was coerced by law enforcement to make false accusations against him, failure to call certain witnesses, and failure to call witnesses in an attempt to prove that defendant was not guilty of the prior offenses to which he pleaded. After counsel responded, the court denied the motion.

### j. *Tenth* Marsden *Hearing – December 15, 2017*

The final *Marsden* hearing took place on December 15, 2017 immediately before sentencing. Defendant raised a number of complaints about counsel's trial performance and strategy. The court informed defendant "this sounds like information you can provide to your appellate attorney. That's a totally different issue from concerns you may have about your attorney, your current attorney with regards to the *Marsden*." Defendant also took issue with the information counsel chose to include in and exclude from the *Romero* motion. Counsel responded by explaining various tactical decisions he made during trial, including not calling certain witnesses and the content of his closing argument. The court denied the motion.

### 3. *The Trial Court did not Abuse its Discretion in Denying the Motions*

Defendant's *Marsden* motions largely highlighted persistent disagreements between himself and his appointed counsel about trial strategy. Defendant wanted to argue that D. was coerced into making false accusations by police and her parents; trial counsel feared that strategy would backfire given D. had denied any such coercion at the preliminary hearing. Defendant wanted more of his students that lived in D.'s apartment building to testify on his behalf to explain his presence there; trial counsel feared those witnesses would be less favorable than defendant anticipated when they learned about his prior convictions and D.'s allegations. Defendant was concerned by discrepancies between two translations of D.'s journal; defense counsel viewed those discrepancies as

16

unimportant because the central and damaging portions of the translations were the same. Tactical disagreements such as these do not by themselves constitute an irreconcilable conflict. (*Frederickson*, *supra*, 8 Cal.5th at p. 1001.)

Defendant repeatedly complained that counsel was too negative in his perception of the case. This was a particularly challenging case from the defense perspective. Defendant had prior convictions for child sex offenses, evidence of which was admitted to prove his propensity to commit the charged sexual offenses. Despite knowing his conditions of parole precluded him from having contact with minors, defendant agreed to tutor minors and lied to his parole officer about doing so. Once D. decided to disclose the relationship, her account of it was relatively consistent. Significantly, her description of her relationship with defendant as romantic was corroborated by numerous text messages in which both D. and defendant proclaimed their love for one another and referred to one another by terms of endearment. As the trial court explained to defendant during the first *Marsden* hearing, counsel was simply doing his job by preparing defendant for all possible outcomes.

Counsel had adequate explanations for the other issues defendant raised. For example, while defendant complained that counsel failed to explain and include him in the jury selection process, counsel stated that defendant participated in that process, during which the two worked together well; when defendant accused counsel of being dishonest about whether he intended to have the victim draw defendant's penis at trial, counsel explained there had been a misunderstanding. The trial court was entitled to resolve those credibility questions in counsel's favor. (*People v. Abilez* (2007) 41 Cal.4th 472, 488.)

Defendant suggests that the sheer number of *Marsden* motions demonstrates the existence of an irreconcilable conflict between himself and appointed trial counsel. We disagree. Given the repetitive nature of the motions, the trial court reasonably could have concluded that defendant "had made insufficient efforts to resolve his disagreements

17

with" counsel and "that any breakdown in his relationship with counsel was attributable to his own attitude and refusal to cooperate." (*Clark*, *supra*, 52 Cal.4th at p. 913.) " '[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict.' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 600.)

For the foregoing reasons, we conclude that defendant fails to show that the court abused its discretion in denying his requests to substitute counsel.

### 4.     *Any Error was Harmless*

Even had the court erred in declining to replace defendant's appointed trial counsel, we would find such error harmless.

Defendant says that any error in the denial of his *Marsden* motions is per se reversible regardless of any showing of prejudice. It is true that, "[i]n certain Sixth Amendment contexts, prejudice is presumed. [For example, a]ctual or constructive denial of the assistance of counsel *altogether* is legally presumed to result in prejudice." (*Strickland v. Washington* (1984) 466 U.S. 668, 692, italics added.) But prejudice is presumed only where "the attorney's failure [to test the prosecutor's case is] . . . complete." (*Bell v. Cone* (2002) 535 U.S. 685, 697; *United States v. Cronic* (1984) 466 U.S. 648, 659 ["if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"].) That plainly is not the case here. Accordingly, the beyond-a-reasonable-doubt standard for assessing prejudice applies. (*People v. Loya* (2016) 1 Cal.App.5th 932, 945 [denial of *Marsden* motion reviewable under *Chapman v. California* (1967) 386 U.S. 18].)

The evidence of defendant's guilt was extremely strong. D. testified clearly about her relationship and sexual encounters with defendant. Text messages defendant admitted to sending D. corroborated her testimony that the two were in a romantic relationship. While defendant advocated various defense strategies that trial counsel declined to pursue, defendant never offered a credible explanation for why he messaged

18

his 15-year-old student things such as "I love you"; "I feel like I will fall apart if I don't see you"; and "Good night, precious." Evidence that defendant had committed sexual offenses against other children was admitted to prove his propensity to commit the charged sexual offenses. Given the strength of the evidence against defendant, we conclude that the Attorney General has proved beyond a reasonable doubt that any error in declining to replace defendant's appointed trial counsel did not contribute to the verdict.

### B.      CSAAS Testimony

Defendant raises a number of claims of error based on the admission of Carmichael's CSAAS testimony.

#### 1.      Scientific Reliability

Defendant argues that CSAAS has not been generally accepted as reliable by the scientific community, such that the trial court erred in failing to exclude Carmichael's testimony under *People v. Kelly* (1976) 17 Cal.3d 24, abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848.

In *Kelly*, the California Supreme Court "held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community." (*People v. Bolden* (2002) 29 Cal.4th 515, 544.) *Kelly* applies only "to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*).) Generally, the unproved procedure generally is one that "provide[s] some definitive truth which the expert need only accurately recognize and relay to the jury" or otherwise "carr[ies] an equally undeserved aura of certainty." (*Ibid.*)

19

Our colleagues in Division 6 of the Second District Court of Appeal recently considered and rejected an identical argument. (*People v. Munch* (2020) 52 Cal.App.5th 464, 472.) As the *Munch* court noted, CSAAS testimony is not "*new* experimental scientific evidence ' "not previously accepted in court," ' " but rather "has been ruled to be properly admitted by the courts of this state for decades. [Citations.]" (*Ibid.*) Furthermore, CSAAS testimony does not purport to provide any "definitive truth" but merely attempts to allay misconceptions that laypersons may harbor about the conduct of molestation victims. (*Stoll*, *supra*, 49 Cal.3d at p. 1156.) Therefore, it is not subject to *Kelly*.

### 2.     *Evidence Code Section 352*

Defendant maintains the trial court erred by not excluding Carmichael's testimony as substantially more confusing and prejudicial than probative under Evidence Code section 352.

Only relevant evidence is admissible. (Evid. Code, § 350.) The Evidence Code defines "relevant evidence" broadly as "evidence . . . having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210, italics added.) " '[T]he trial court has broad discretion to determine the relevance of evidence.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) "On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) For purposes of Evidence Code section 352, evidence is "prejudicial" if it " ' "uniquely tends to evoke an emotional bias

against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).) " ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.) "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*Kipp, supra,* at p. 1121.)

Defendant contends Carmichael's testimony was not probative as to any material disputed fact. We disagree. Defendant testified that D. was lying about having a romantic and sexual relationship with him. In closing, defense counsel "encourage[d] jurors] to consider her testimony . . . a lie," noting that she kept the relationship a secret from her parents and did not disclose it to police during the initial interview. Plainly D.'s credibility was in dispute. In California, CSAAS evidence has long been held to be "pertinent and admissible if an issue has been raised as to the victim's credibility." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745 (*Patino*).) Moreover, defense counsel argued that D.'s conduct after the abuse, including her delayed disclosure and secrecy, were "inconsistent with . . . her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) CSAAS evidence "is admissible to rehabilitate such witness's credibility . . . ." (*Ibid.*)

Defendant further argues that CSAAS evidence is relevant only where the victim is preadolescent and "not to explain conduct occurring when a 15-year-old girl willingly participates in a sexual relationship that was essentially consensual in fact." We are somewhat puzzled by this argument, as it is premised on the truth of D.'s account—that she was in a loving, romantic, sexual relationship with defendant. But, if that is true, then

defendant is guilty and the admission of the CSAAS testimony was not prejudicial. In any event, no legal authority supports the position that CSAAS applies only to certain categories of minors or those under a particular age. And Carmichael testified that CSAAS applies even "if the sexual touching starts when the child is an adolescent . . . ." Defense counsel was free to argue to the jury—as he does on appeal—that D. was inordinately mature, such that she would not have responded like the typical minor described by Dr. Summit.

Turning to the issues of confusion and prejudice, "[i]t is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred. It can be highly prejudicial if not properly handled by the trial court. It is unusual evidence in that it is expert testimony designed to explain the state of mind of a complaining witness. The particular aspects of CSAAS are as consistent with false testimony as with true testimony. For these reasons, the admissibility of such testimony must be handled carefully by the trial court." (*Patino*, *supra*, 26 Cal.App.4th at p. 1744.)

Here, the potential for juror confusion and prejudice was minimized by Carmichael's testimony that he was unaware of the underlying charges and facts in this case and that it is up to juries to decide whether allegations of sexual abuse are true. The potential for confusion and prejudice was further minimized by Carmichael's testimony that CSAAS is not a diagnostic tool and by the fact that the court instructed jurors that "Dr. Blake Carmichael's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him." For the reasons discussed above, we conclude the trial court did not abuse its discretion in declining to exclude the CSAAS testimony under Evidence Code section 352.

### 3. CALCRIM No. 1193

Defendant further maintains the trial court erred in instructing the jury with CALCRIM No. 1193, which he says improperly authorizes jurors to rely on expert

CSAAS testimony to evaluate the credibility of a complaining witness. The parties dispute whether defendant properly preserved this claim of error for appeal. We assume the issue has not been forfeited and reject it on the merits.

### a. Factual Background

The trial court instructed the jury with CALCRIM No. 1193 as follows: "You've heard testimony from Dr. Blake Carmichael regarding Child Sexual Abuse Accommodation Syndrome. Dr. Blake Carmichael's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [D.]'s conduct was not inconsistent with the conduct of someone who has been molested and *in evaluating the believability of her testimony.*" (Italics added.) On appeal, defendant takes issue with the final, italicized phrase.

### b. Standard of Review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The pertinent inquiry is whether the instructions as a whole fully and fairly set forth the applicable law. (*Ibid.*) Where jury instructions are ambiguous or internally inconsistent, and therefore subject to an erroneous interpretation, we assess whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) If there is such a reasonable likelihood, then we consider whether the instructional ambiguity was prejudicial. (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.)

### c. Analysis

Defendant argues that using CSAAS evidence to "evaluat[e] the believability of [the complaining witness's] testimony" is equivalent to using the evidence "to determine whether the victim's molestation claim is true," something case law prohibits. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 ["the jury must be instructed simply and directly

23

that the expert's [CSAAS] testimony is not intended and should not be used to determine whether the victim's molestation claim is true"].) We are not persuaded.

CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused[. But] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) Here, there was evidence that the victim engaged in conduct that might appear inconsistent with molestation (and thus undermine her credibility), including delayed disclosure of the abuse. Carmichael testified that CSAAS is designed to dispel myths about child sexual abuse and that abused children often fail to disclose the abuse in a timely fashion. He testified that CSAAS is not used to determine whether sexual abuse actually occurred and he offered no opinion as to the veracity of the allegations in this case. CALCRIM No. 1193 specifically informed the jury that Carmichael's testimony "is not evidence that the defendant committed any of the crimes charged against him."

In view of the foregoing, there is no reasonable likelihood that the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence to determine defendant's guilt. Rather, it is likely the jury properly understood CALCRIM No. 1193 as permitting it to use the CSAAS evidence in evaluating the believability of D.'s testimony that the sex acts occurred, in light of the evidence that she engaged in conduct seemingly inconsistent with the conduct of a child who had been molested. Therefore, we reject defendant's claim.

### 4. *Federal Due Process Claim*

Finally, defendant contends that the admission of the CSAAS evidence and the manner in which the jury was instructed regarding that evidence denied him a fair trial in violation of his due process rights. Defendant's due process claim is based arguments we have rejected—namely, that the CSAAS testimony constituted unreliable scientific

24

evidence and lacked probative value and that the jury was misinstructed as to its use. Having rejected those underlying contentions, we likewise must conclude the admission of and instruction as to the CSAAS evidence did not deny defendant a fair trial.

## III. DISPOSITION

The judgment is affirmed.

_____

ELIA, J.


WE CONCUR:




_____

GREENWOOD, P.J.




_____

BAMATTRE-MANOUKIAN, J.




*People v. Reeves*
H045376